IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| CAPITAL SOLUTIONS, LLC, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> KONICA MINOLTA BUSINESS ) <br> SOLUTIONS U.S.A., INC., and ) <br> BANK OF OKLAHOMA, N.A., ) <br> ) <br> Defendants. ) <br> ) <br> _____) | Case No. 08-2027-JWL |
| BANK OF OKLAHOMA, N.A., ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> CAPITAL SOLUTIONS, LLC; ) <br> MIKE BREAKEY; LARRY SEWARD; ) <br> LEE ULLMAN; and MIKE EARL, ) <br> ) <br> Defendants. ) <br> ) <br> _____) | Case No. 08-2191-JWL |

## **MEMORANDUM AND ORDER**

In these two cases that have been consolidated for pretrial purposes, Capital Solutions, LLC ("Capital") brings claims against defendant Konica Minolta Business Solutions U.S.A., Inc. ("KMBS") arising out of their relationship in which KMBS administered business equipment leases funded and held by Capital. Capital originally

asserted claims against Bank of Oklahoma, N.A. ("BOK"), but it has abandoned those claims in the Pretrial Order. BOK has asserted claims against Capital relating to loans to and a security agreement with Capital; claims against Capital's principals (defendants Mike Breakey, Larry Seward, Lee Ullman, and Mike Earl) based on their guaranties of the Capital loans; and claims against KMBS arising out of that party's relationship with Capital.

The Court recently made various rulings with respect to motions for summary judgment by KMBS and BOK. *See* Memorandum and Order of Feb. 5, 2010 (Doc. # 270). In that order, the Court retained under advisement KMBS's motion for summary judgment as it relates to Capital's claims for damages for lost profits and for the failure of Capital's business or its banking relationship with BOK. *See id.* at 18-20. The Court held that KMBS's foreseeability and causation arguments involve questions of fact for the jury to resolve, but it retained under advisement KMBS's remaining argument that Capital cannot establish such damages with reasonable certainty. *See id.* at 19-20. The Court concluded that that issue was better considered in conjunction with KMBS's motions to exclude testimony by Mike Earl, a principal of Capital whom Capital intends to offer to testify about these damages. *See id.* at 20. The Court addresses those motions and the remaining summary judgment issue in this order.

The Court concludes that Mr. Earl may not offer testimony as an expert witness concerning these damages pursuant to Fed. R. Evid. 702 in this case, for the following three reasons: he was not properly disclosed as an expert witness; he is not sufficiently

2

qualified to give such opinions; and the method of his calculations of lost profits has not been shown to be reliable. Accordingly, the Court **grants** KMBS's motion to exclude expert testimony by Mr. Earl (Doc. # 266). The Court further concludes that Capital has not submitted other evidence sufficient to support these claims for damages in opposition to summary judgment. Accordingly, the Court awards KMBS summary judgment on these damage claims; **grants in part** KMBS's motion for summary judgment, to the extent that it relates to these damage claims (Doc. # 184); and **grants** KMBS's motion to exclude opinion testimony by Mr. Earl concerning these damage claims (Doc. # 188).

### I. Expert Opinion Testimony by Mr. Earl

Capital seeks to offer expert opinion testimony by Mr. Earl, pursuant to Rule 702, concerning his calculations of lost profits suffered by Capital. The Court agrees with KMBS that such testimony should be excluded, for a number of reasons.

First, the Court concludes that Capital did not disclose Mr. Earl as an expert witness in a timely manner. In its initial disclosures pursuant to Fed. R. Civ. P. 26(a)(1), made in July 2008, Capital identified Mr. Earl as a person likely to have discoverable information, but it did not identify the subjects of that information as required by the rule. The parties' deadline for expert witness disclosures pursuant to Rule 26(a)(2) (February 18, 2009) then passed without any disclosures by Capital. Capital served supplemental disclosures on April 20, 2009, in which Capital stated that it "intends to call the expert hired by the Bank of Oklahoma, as well as Mike Earl to substantiate the

3

calculations of damages shown below." Capital made the same statement in setting forth its damage claims in that supplemental disclosure (including lost profits of $200,000 per year and lost profits of $125,000 relating to a failed $800,000 transaction). That disclosure did not give KMBS notice that Mr. Earl might offer expert opinion testimony, however, as Mr. Earl's "substantiation" of the BOK expert's calculations might have involved purely factual testimony to support assumptions made by the BOK expert.

In its damage contentions in the Pretrial Order, which were submitted in September 2009, Capital again states that "[t]he manner of calculation for Capital Solutions' lost profits . . . is reflected in the expert report prepared by the BOK's expert," and that its would call that expert and Mr. Earl "to substantiate" those calculations. Capital also refers to Mr. Earl's "schedules" relating to lost profits, and further states as follows:

> Mike Earl is expected to testify consistently with the graphical information that has been provided to KMBS. Mike Earl's testimony assumes that Capital Solutions' cost of operations remain [sic] the same, while including a default rate that was normally expected within the trade. Mr. Earl has used the records that have been produced in discovery in order to formulate his opinions on lost profits.

Thus, Capital referred to "opinions" by Mr. Earl for the first time concerning lost profits, but otherwise indicated only that he would "substantiate" or "testify consistently" with the BOK expert and particular records. Again, however, Capital failed to disclose that Mr. Earl would provide *expert* opinion testimony pursuant to Rule 702. Accordingly, until it responded to KMBS's motion in limine, Capital never disclosed Mr. Earl as an

4

expert opinion witness, and Capital has never provided an expert report that complies with Rule 26(a)(2).[1]

The Court does not agree with Capital that Mr. Earl was effectively disclosed as an expert in his deposition of May 28, 2009. Mr. Earl was deposed not as an expert witness, but as the representative of Capital pursuant to Fed. R. Civ. P. 30(b)(6). At the conclusion of the deposition, on cross-examination by Capital's own counsel, Mr. Earl testified as follows:

> Q. Were you familiar with about an $800,000 funding transaction sometime in 2006 that wasn't funded by BOK?
>
> A. Yes.
>
> . . .
>
> Q. Have you been able to calculate what that stream of income would have been?

---

[1] The Court rejects Capital's argument that no report was required under Rule 26(a)(2) because, as a principal of the company, Mr. Earl was not "retained or specially employed" to provide expert testimony. Mr. Earl's proposed opinions are not based solely on his observations while working for Capital, but instead have been formed specifically for litigation, purportedly based on documents produced in discovery and such variables as a lease default rate standard in the industry. *See, e.g.*, *Sellers v. Butler*, 2006 WL 2714274, at *3 (D. Kan. Sept. 22, 2006) (for treating physicians, application of expert report requirement depends not on the their status, but on the scope of their testimony); *cf. Full Faith Church of Love West, Inc. v. Hoover Treated Wood Prods., Inc.*, 2003 WL 169015, at *2 (D. Kan. Jan. 23, 2003) (applying rule for treating physicians to general contractors offering expert opinions; no reports required where testimony was based only on facts learned during the course of their work as contractors). Even if no report were required here, however, the Court would nevertheless conclude that Capital's failure to disclose Mr. Earl as an expert in a timely manner warrants the exclusion of expert testimony by him.

>     A.   Yes.
>
>     Q.   What was that?
>
>     A.   It was approximately $200,000.
>
>     Q.   . . . [H]ave you been able to calculate what the lost profits would have been?
>
>     A.   I think we're looking at about a million dollars or more?
>
>     Q.   How did you go about calculating that?
>
>     A.   Taking the existing business at the level it was at and putting in the cash flow between the spread of the borrowing funds and the lease rate, residual value, present value of that and discount for a bad lease or a default ratio that the business was a million dollar plus business.

Again, however, Mr. Earl was not identified as an expert witness. He could merely have been stating Capital's claims as its corporate representative. The fact that Capital did not offer Mr. Earl as an expert at that time is confirmed by the fact that Capital objected to any inquiry into Mr. Earl's experience and background in the deposition.

Capital also argues that it satisfied any expert report or disclosure obligation by providing Mr. Earl's "notebook" containing his calculations to opposing counsel at the deposition. The deposition transcript indicates that Mr. Earl provided a binder of records of the business at the deposition, but there is nothing in the discussion of those records in the transcript to indicate that the binder contained anything relating to lost profits. Nor has Capital submitted any records from that binder in response to these motions. Thus, the Court cannot conclude that any written material supporting any expert opinions

6

by Mr. Earl was ever submitted to KMBS prior to Capital's responses to the instant motions.[2]

Therefore, the Court concludes that Capital never properly disclosed Mr. Earl as an expert witness.[3] (Even in response to these motions, Capital has not attempted to supplement its disclosure statements or provided an expert report that complies with Rule 26(a)(2).) KMBS was entitled to rely on Capital's disclosures or lack thereof, and given the proximity to trial, KMBS would suffer unfair prejudice if Capital were now permitted to call Mr. Earl as an expert witness. Nor was Capital justified in failing to disclose Mr. Earl as an expert. For this reason, the Court will prohibit Mr. Earl from offering expert opinion testimony at trial pursuant to Rule 702. *See* Fed. R. Civ. P. 37(c)(1) (party who fails to disclose a witness under Rule 26(a) may not use such witness unless the failure was substantially justified or is harmless); *Sims v. Great Am. Life Ins. Co.*, 469 F.3d 870, 895 (10th Cir. 2006) (district court properly excluded expert witness who was not timely disclosed).

As an independent basis for the exclusion of expert testimony by Mr. Earl, the

---

[2]KMBS has also provided copies of e-mails from Capital's counsel to KMBS's counsel in September 2009 that included various spreadsheets, but the e-mails did not refer to lost profits, and there is nothing to indicate that any of the attachments related to lost profits calculations. Capital has not cited to those e-mails in its opposition to the motions.

[3]Capital argues that Mr. Earl could not formulate a final opinion in light of KMBS's failure to supplement its discovery responses. Even if Mr. Earl could not arrive at final damage figures, however, Capital was at least required to disclose Mr. Earl as an expert, along with the method by which he intended to calculate lost profits.

7

Court concludes that Capital has not shown either that Mr. Earl is qualified to give his opinions or that his opinions are sufficiently reliable. *See Farmland Mut. Ins. Co. v. AGCO Corp.*, 531 F. Supp. 2d 1301, 1304-05 (D. Kan. 2008) (setting out standards for the admissibility of expert opinion testimony under Supreme Court's *Daubert* and *Kumho Tire* cases). KMBS argues that Mr. Earl is not qualified to render an expert opinion on the amount of lost profits, particularly in light of the fact that Mr. Earl was involved in the equipment leasing business only during a short period in 2007 while Capital was still operating. In response to that argument, Capital has provided sworn declarations in which Mr. Earl has stated his employment and business background, which in recent years consisted primarily of work in the real estate field. There is nothing in that background, however, that would suggest that Mr. Earl is qualified, either as an expert economist or accountant or as an expert within the field of business equipment leasing, to render an opinion concerning lost profits in this case. Similarly, in its briefs, Capital has not explained why Mr. Earl is qualified to give an opinion based on his "specialized knowledge" concerning lost profits, other than to refer to the declarations. *See* Fed. R. Civ. P. 702. Capital also argues that Mr. Earl is qualified to perform the simple calculations that support his opinions, but Capital has not addressed his qualifications to offer opinions concerning the particular variables used in those calculations, including the rate of defaulted leases. Therefore, the Court concludes that Mr. Earl has not been shown to possess the qualifications necessary to offer expert testimony concerning lost profits.

Nor has Capital shown that the proposed expert opinions are reliable, as Mr. Earl has never fully explained his methodology in calculating lost profits. The Pretrial Order and Mr. Earl's deposition testimony indicate that Mr. Earl would assume that the business and costs of Capital would continue at the same level, and in the deposition Mr. Earl referred generally to the use of the "spread of the borrowing funds and the lease rate, residual value, present value of that and discount for a bad lease or a default ratio." Mr. Earl did not testify, however, about how he arrived at the figures he used for the spread, the residual value, or the default ratio, or indicate how he performed any present value calculation.

In Mr. Earl's latest declaration, he stated that Capital was a simple company operating under a simple business concept by which buy-back payments and the spread between the lease rate and Capital's borrowing rate made up its profit. He did not offer any explanation of his calculation beyond that superficial description of the general business model, however. Mr. Earl attached two single-page spreadsheets to his declaration by which he "calculated the amount of net income to Capital." The first spreadsheet appears to show Capital's historical net profit (after deducting interest costs, administrative expenses, and a write-off for "bad debt" or "non-performing leases") from over eight million dollars in leases that it funded in the past. It is not clear how this spreadsheet relates to Capital's lost profit claim; in its latest opposition brief, Capital states that this spreadsheet is "based on the actual performance of the company from its inception to date," and shows that Capital was profitable. Capital states that the second

9

spreadsheet "is based on the same real life operational fundamentals" as the first spreadsheet and shows the profitability of Capital at a level of a lease portfolio of 5.9 million dollars (the largest amount that Capital ever used from its credit line with BOK). The spreadsheet indicates that it is "based on ongoing operations." Thus, this spreadsheet, which indicates a net profit of $635,386.90, or $145,898.25 "annualized", representing 7.81% of revenue, would appear to represent Capital's lost profit claim.

In a footnote in its latest opposition brief, Capital laid out its damage claim as follows:

> In summary, based on this factual information [in the two spreadsheets], Capital solutions [sic] lost $63,000 due to not being able to fund the $811k lease (811k x 7.81% net profit margin), some 400k plus in excess interest and late fees from the actual portfolio, plus $145k on an annual basis going forward.
>
> This does not take into consideration any value of the company as an ongoing concern, which is substantial.

This summary is not contained in Mr. Earl's declaration, however, or even in the spreadsheets. Mr. Earl's declarations do not contain anything about the value of the business. It is unclear where the "400k plus" figure comes from. Counsel has derived the $63,000 figure by multiplying the 7.81% figure on the historical spreadsheet by the $811,000 amount of the non-funded leases, and taken the $145k" figure from the net profit total on the second spreadsheet.

Nevertheless, this explanation still does not show the complete methodology by which Mr. Earl made his calculations, as there remains no explanation for the particular

10

figures and variables used on the spreadsheets. For instance, the second spreadsheet contains deductions of $50,000, $10,000, and $60,000 for "other operations expenses," but there is no explanation of the expenses represented by those figures. Most significantly, Mr. Earl has never explained how he arrived at a rate for defaulted leases or bad debt—a significant variable in the calculations. Mr. Earl and Capital are not at liberty merely to set out figures and variables without explanation; KMBS has challenged the reliability of Mr. Earl's methodology, and in response Capital has failed to explain that methodology. Thus, the Court cannot conclude that Mr. Earl's methodology is in fact reliable. In performing its gate-keeping function, the Court must therefore exclude the proposed expert testimony by Mr. Earl.

## II.     **Summary Judgment on Lost Profits Claims**

The Court now addresses the remaining issue from KMBS's motion for summary judgment—whether Capital can establish the amount of its lost profits with reasonable certainty. *See Kelley Metal Trading Co. v. Al-Jon/United, Inc.*, 877 F. Supp. 1478, 1484 (D. Kan. 1995) (lost profits must be proven with "reasonable certainty") (citing *Vickers v. Wichita State Univ.*, 213 Kan. 614, 618, 518 P.2d 512, 515 (1974)). The Kansas Supreme Court has offered the following explanation of the type of evidence needed to meet this standard for proving lost profits:

> Unquestionably, a method of establishing a loss of profits with reasonable certainty is by showing a history of past profitability. Past profitability of a particular business is not, however, the only method of

11

proving lost future profits. The evidence necessary in establishing lost future profits with reasonable certainty must depend in a large measure upon the circumstances of the particular case. Absolute certainty in proving loss of future profits is not required. What is required is that the court or jury be guided by some rational standard. As to evidentiary matters a court should approach each case in an individual and pragmatic manner, and require the claimant to furnish the best available proof as to the amount of loss that the particular situation admits. It is the responsibility of a district court to see that speculative and problematical evidence does not reach the jury.

*Vickers*, 213 Kan. at 620, 518 P.2d at 517 (citations and internal quotations omitted).

With the exclusion of expert testimony by Mr. Earl, the question now becomes whether Capital has submitted other evidence (lay testimony by Mr. Earl or other evidence) to establish a reasonably certain claim for lost profits.[4] KMBS has conceded in its brief that expert testimony is not an absolute prerequisite for a claim of lost profits. In any event, the Court concludes that Capital has failed to submit evidence sufficient to withstand summary judgment on these claims.

First, the Pretrial Order includes a claim for $300,000 for the value of Capital. Capital has not provided any evidence to support that figure, however. Even though Capital's most recent response to KMBS's motion to exclude Mr. Earl's testimony refers to such a claim, the accompanying declaration by Mr. Earl contains no reference to the value of Capital. Accordingly, summary judgment is awarded to KMBS on any damage

---

[4]Although Capital refers to expert testimony by BOK's expert witness in the Pretrial Order, Capital has not submitted any such evidence in opposition to summary judgment. Moreover, it does not appear that that expert's report (found elsewhere in the record) contains any reference to lost profits.

claim based on the destruction of Capital or its banking relationship or on the value of Capital.

The Court next considers Capital's evidence to support its lost profits claims. In its summary judgment response, Capital argues that it is entitled to profits on the lost $881,000 financing and lost profits on its line of credit with BOK generally. In its summary judgment papers, however, Capital did not provide any evidence of the actual amount of those lost profits claims or indicate why such amounts may be determined with sufficient certainty. Capital submitted a declaration by Mr. Earl with its summary judgment opposition, but that declaration contains no reference to lost profits.

Capital did not cite to Mr. Earl's deposition testimony in opposition to summary judgment. Nevertheless, the Court has reviewed the transcript of that deposition, which KMBS submitted in its entirety. As noted above, on cross-examination by Capital's own counsel, Mr. Earl testified that the "stream of income" on the failed $800,000 funding transaction would have been "approximately $200,000." Mr. Earl did not explain how that amount was determined or how that amount of the "stream of income" relates to Capital's claim for lost profits on that transaction. Mr. Earl further testified that lost profits generally would have been "about a million dollars or more," which he calculated by "[t]aking the existing business at the level it was at and putting in the cash flow between the spread of the borrowing funds and the lease rate, residual value, present value of that and discount for a bad lease or a default ratio." Again, Mr. Earl did not offer any testimony about a specific amount of lost profits; the figures used for the

13

spread or the residual value; how he determined present value; or the particular default ratio and how it was derived. Moreover, as noted above, although Mr. Earl states that he provided his "notebook" during the deposition, there is no evidence that that binder contained any additional support for Mr. Earl's lost profits calculations. Accordingly, the Court concludes that Mr. Earl's deposition testimony, in which he gave general estimates without any details of specific methodology, is not sufficient to show a specific lost profits claim that is reasonably certain and not merely speculative.

Although Capital did not refer to Mr. Earl's other declarations (submitted in response to the motions to exclude) in opposing summary judgment, the Court has nonetheless reviewed those declarations as well.[5] The declaration by Mr. Earl submitted in response to KMBS's first motion in limine contains only the following reference to these damage claims at issue:

> 19. With the information I have, I have performed several calculations regarding Capital Solutions' damages in this matter. I turned over the basis for my calculations to John Schenk in my deposition in a Notebook that I prepared for his review.
>
> 20. However, also attached are a few documents I completed with the information I had. These detail the lost profits, based on the incomplete information I have.

Attached to the declaration are two single-page spreadsheets that are identified respectively as "Income from $811,000 leases that were not funded" and "Analysis of

---

[5] It is unclear when any of the three declarations was made or which declaration came first, as none is dated.

14

5 year income stream from base 8M portfolio." The spreadsheets list figures for each of 60 months for loan payments, expenses, and net income, with final totals for "lost income" of $198,456.03 and $1,571,255.57 respectively. The spreadsheets do not include any explanation of the interest and lease rates used, the $811,000 and $8,000,000 amounts used, or the bases for expenses for each lease. The first spreadsheet does not include any deductions for "bad debt" or defaults by lessees; the second spreadsheet makes a two percent deduction for "bad debt", but it contains no explanation for the source of that percentage rate.

These spreadsheets are apparently no longer valid, however, in light of the new spreadsheets submitted with Mr. Earl's third declaration. The Court has already described that declaration and the new spreadsheets attached thereto. In the declaration itself, Mr. Earl again states that he has performed calculations that may be found in the spreadsheets. This last declaration does include some additional statements about the simplicity of the business model, with the spread between interest rates and the buy-back amounts comprising the company's profit, but Mr. Earl still has not explained the particular amounts or variables used in the calculations. Again, the most glaring omission is any explanation for how to account for defaulted or non-performing leases. Thus, the Court concludes that even if it were to consider Mr. Earl's two latest declarations for purposes of its summary judgment analysis, those declarations do not provide sufficient evidence to demonstrate a lost profits amount that is reasonably certain, as required under Kansas law.

15

It is not inconceivable that, even without expert testimony, Capital might have made out a submissible claim for lost profits. For instance, Mr. Earl might have been able to provide lay testimony about Capital's historic performance and opine that profits would have been the same in the future but for KMBS's conduct. In response to KMBS's summary judgment motion, Capital was required to submit such evidence, if it intended to rely on such a theory. Capital has not provided any evidence of sufficient detail regarding past profits, however, from which future profits might be determined with reasonable certainty. Again, the most significant example concerns the lack of any evidence explaining Capital's past rates for defaulted leases, a significant variable in determining Capital's profits. Moreover, Capital made clear in the Pretrial Order that it intended to rely on a default rate "normally expected in the trade"—a subject that would require specialized knowledge and therefore expert testimony. Capital has provided no such evidence. Accordingly, the Court awards KMBS summary judgment on Capital's claims for lost profits.

Finally, because Capital may not pursue its claims for lost profits, the Court grants KMBS's motion in limine to exclude all opinion testimony by Mr. Earl, including lay witness opinion testimony, relating to those claims.

IT IS THEREFORE ORDERED BY THE COURT THAT KMBS's motion for summary judgment (Doc. # 184) is **granted in part**, to the extent that the motion relates to Capital's claims for damages for lost profits and for the failure of Capital's business

or its banking relationship with BOK, and KMBS is awarded summary judgment on those claims.

IT IS FURTHER ORDERED BY THE COURT THAT KMBS's motions to exclude expert and other opinion testimony by Mike Earl (Doc. ## 188, 266) are **granted**, and Mr. Earl will be prohibited at trial from offering any expert testimony or any opinion testimony relating to lost profits or the value of Capital.

IT IS SO ORDERED.

Dated this 12th day of February, 2010, in Kansas City, Kansas.

s/ John W. Lungstrum
John W. Lungstrum
United States District Judge
